E-FILED
Thursday, 08 January, 2009  05:27:41 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PATRICIA MEYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 07-3010 |
| | ) | |
| CITY OF SPRINGFIELD, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Patricia Meyer brings this case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., based upon the City of Springfield's termination of her employment, which she alleges was because of her gender.

Pending before the Court is the City's motion for summary judgment.

The motion is allowed.

## I. BACKGROUND

### (A)

Plaintiff Patricia Meyer was employed by Defendant City of

Springfield as Assistant Waterworks Operator I from November 12, 1996, until October 25, 2003.   Meyer held the position of Water Works Maintenance Person from October 26, 2003, until her termination with the City on September 20, 2005.

In support of its summary judgment motion, the City notes that Meyer had several disciplinary incidents before her termination.   She received a three-day suspension on August 15, 2003, for failing to check the carbon feed pumps as required and for recording false data.  Meyer received a written warning on October 5, 2003, for falsifying data when she partially pre-filled a data sheet with carbon data and an operator checklist prior to the performance of her actual rounds.   She was told in writing that "[f]urther incidents of this nature will result in further progressive discipline, up to and including termination."   Meyer received a written warning on February 26, 2004, for failing to perform chlorine inspections and was told in writing that further incidents could result in her termination.

The City alleges that Meyer was terminated on September 20, 2005, because of an incident three months earlier when she failed to properly

monitor a lime slaker, and a history of other disciplinary actions.  Meyer claims that she was terminated because of the City's discrimination on the basis of gender.

On June 24, 2005, it was Meyer's responsibility to monitor the lime slaker by reviewing the pH levels to ensure that, if a problem occurred, it would be addressed immediately.  Ted Meckes, the General Superintendent of Water Treatment, and Jim Zeigler, a Senior Operator, both stated that Meyer should have monitored the raw pH computer screen every fifteen minutes.  Meyer alleges she acted reasonably in checking the lime slaker.

Computer generated records indicate that the lime slaker was not feeding lime into the water system or was doing so for a very short period of time from 7:40 a.m. until 9:30 a.m. on June 24, 2005, which caused a significant drop in the pH level.  Meyer states that the lime slaker was feeding, but on an intermittent basis.  The drop in the pH informed Meyer that she had a problem with the lime slaker and she needed to feed lime into the water supply.  Meyer alleges the drop indicated she had a potential problem.  However, the investigation revealed that the lime slaker was

3

feeding and that the reason for the drop was that employees were cleaning the filter. Greg Selinger, a senior maintenance man, testified during the civil service hearing he would have gone to the lime slaker if he had seen the pH monitor readings "because that's what happens when the slaker stops feeding [lime]." Selinger testified, moreover, that the computer screens indicated that the lime slaker had stopped feeding.

The City alleges that two visual alarms went off signifying that lime was not being fed into the water supply, but Meyer failed to respond to the alarms even though she acknowledged them. Meyer disputes this assertion, stating that she investigated the first visual alarm and determined that the slaker was feeding and that there was a reason for the drop in pH. She responded to the second visual alarm, found that the lime slaker was not feeding and took appropriate action.

According to the testimony of Selinger, he took charge of the situation and told Meyer what to do and how to handle the situation. He stated he was "calling the shots" by instructing Meyer how to react to the crisis. The City further alleges that while this was occurring, Meyer was on the

4

telephone for long periods of time with individuals who she thought might be able to help.  Meyer states that Selinger was not "calling the shots." Moreover, she was on the phone consulting with knowledgeable persons concerning how best to correct the low pH.

(B)

This incident resulted in an elevated turbidity level in the City's drinking water.  This is illustrated by charts that show filters 9-12 all exceeded 1.0 NTU for two consecutive measurements taken fifteen minutes apart.  The four filters were out of EPA compliance according to Kim Lucas, the chemist who checked the EPA regulations, and David Cook, the EPA Regional Manager.   In addition, all twelve filters exceeded 0.3 NTU. Meyer contends that the City did not have to issue a drinking water alert, there was no health danger as a result of the loss of lime feeding function and no fines or penalties were assessed.  The City alleges that excessive turbidity in the water can cause microorganisms, viruses and bacteria to pass into the water system, which can cause members of the public to become sick and lose confidence in the City's water supply.

5

The City states that paperwork had to be submitted to the EPA notifying them of the triggering event caused by the malfunctioning lime slaker. This was the first time that this type of reporting involving elevated turbidity readings had to be made to the EPA, according to Meckes's testimony. Tom Skelly, the Water Division Manager, said that the turbidity readings were the highest recorded in the plant's history.

Meyer was asked by Kim Lucas what her 11:00 a.m. on-line combined turbidity reading was on the day of the incident. Meyer did not take an 11:00 a.m. reading, but took a reading at 12:50 p.m. that showed a .23 NTU reading. At approximately 1:00 p.m., Meyer called Lucas and told her that the 11:00 reading was .23 NTU, which is within normal operating limits. Meyer also recorded the .23 NTU reading on the data sheet.

The City contends that Meyer gave Lucas a fabricated reading of .23 NTU for the 11:00 a.m. reading, when the actual reading was .62 NTU. Meyer claims that the reading of .23 NTU was a true reading. A reading of .62 NTU indicates that the turbidity level is elevated due to the fact that lime was not feeding into the system for a two hour period. Meyer alleges

6

that the lime was feeding intermittently during this period and was only off for 30-45 minutes.  The City alleges that Meyer's 11:00 a.m. reported reading would indicate that lime was feeding properly into the water supply and that the problem had been taken care of when in fact it had not. Moreover, that reading would have deceived the EPA because the City would have reported that 100% of its June samples for combined turbidity readings were under .30 NTU, rather than the actual 99.7%.  Meckes was required to report the corrected .62 NTU reading to the EPA.  Meyer notes, however, that the computer system recorded the values continuously and on an instantaneous basis, regardless of the information she provided.

According to Selinger, the crisis was under control by 11:00.  He and Meyer were waiting to see how the chemicals were going to react.  Meyer disputes these assertions, stating she was busy trying to resolve the low pH and did not have time to take an 11:00 reading.  The problem was not yet under control and, though it had begun to improve, Selinger lowered the polymer feed, causing the turbidity to rise again and the problem was exacerbated.  Selinger testified that he would have taken readings had she

asked him.

Meyer agreed with Meckes's testimony when she testified that she was told during the carbon feed incident that she should record the actual time she obtained the readings.  Skelly testified it was never appropriate to have inaccurate data in the water treatment process.  Meyer disputes this to the extent that it was a practice not to change times on preprinted forms.

The City contends that although Meyer failed to notify the relevant individuals about the water supply, she did call her brother-in-law, Greg Finigan, who is not in her chain of command and did not receive training in the water treatment process.  Meyer alleges that although Finigan was not trained by the City, he is a chemist who understood the water treatment process and had been consulted by the City before.  Bob Morgan, the Plant Manager, testified that it was normal procedure when a major event occurred to notify either Ted Meckes or himself.  Meyer claims she was told that others were attempting to notify Meckes and Morgan so she promptly went about the business of correcting the problems at hand.

8

(C)

Ted Meckes testified during the Civil Service Commission hearing that he counseled Meyer numerous times regarding her forgetfulness, lack of attention to detail, neglect and similar problems from the beginning of her employment to its end. Meyer alleges that Meckes kept closer scrutiny over her work than that of male employees. The City asserts that Meyer was a slow learner and that operators who had less seniority were ready to perform certain tasks before she was. Moreover, she was provided more training than any other operator, an assertion which Meyer disputes.

Ted Meckes documented numerous counseling sessions he had with Meyer. He also documented counseling sessions with other employees in the department, including Keith Groesch. Meyer asserts that Meckes kept many notes which he said reflected counseling sessions and training sessions. However, the notes made no distinction between counseling sessions and training sessions and Meckes treated Meyer differently from male employees in this regard.

Meyer was asked on February 25, 2004 to provide any documentation

9

to Tom Skelly about employees falsifying data.  She failed to do so.  Meyer asserts that she did not want to get other employees in trouble for minor errors and omissions that never resulted in discipline, but which would have caused ill will toward her from the other employees.

The Interim Enhanced Surface Water Treatment Rule Monitoring Protocol submitted by the City of Springfield was accepted by the Illinois Environmental Protection Agency ("IEPA").  Meckes reported to the IEPA that the City's Water Department had treatment techniques violations as a result of the June 25, 2005, lime slaker incident.

The City further notes that Keith Groesch received a written warning on February 8, 2001, for his treatment of personnel at a shoe store. Groesch received a three-day suspension on August 21, 2003, for failing to check the carbon feed pumps every two hours and for recording false data like Meyer.  Groesch received a five-day suspension on October 10, 2003, for flooding the waste water treatment pump house.  Meyer claims that Groesch's discipline was handled more favorably than was hers.

Groesch was served termination paperwork on January 21, 2005, and

10

was subsequently removed from the Water Department for an incident wherein he failed to remedy an oil leak in a water basin, and for having three incidents within a nineteen month period.   Meyer again claims Groesch's discipline was handled more favorably in that he was told that his pay would not significantly change if he chose to transfer, rather than be terminated.  Moreover, the incident with the oil leak cost the City overtime pay whereas Meyer's lime slaker incident did not.

Keith Groesch avoided termination by being transferred to another City department.   Meyer refused to sign the offer that would have transferred her to another department in lieu of termination.

## II. ANALYSIS

A. Legal standards

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Rule 56(c) mandates

the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  If a defendant can show the absence of some fact that the plaintiff must prove at trial, then the plaintiff must produce evidence, and not merely restate his allegations, to show that a genuine issue exists.  Sartor v. Spherion Corp., 388 F.3d 275, 278 (7th Cir. 2004).  The Court construes all facts and makes all reasonable inferences in favor of the non-moving party.  Magin v. Monsanto Co., 420 F.3d 679, 686 (7th Cir. 2005).

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).

B. Indirect method

The City asserts that Meyer is unable to make out a prima facie case

12

of unlawful discrimination under Title VII using the indirect method.  A plaintiff establishes a prima facie case of gender discrimination by showing: "(1) she is a member of the protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated male employees more favorably." Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dept., 510 F.3d 681, 687 (7th Cir. 2007).  If the plaintiff meets her prima facie burden, the employer must then come forward with a legitimate, non-discriminatory reason for the adverse employment action.  See id.  The employee then can attempt to rebut the employer's proffered reason by showing it is a mere pretext for discrimination.  See id.

The City contends that Meyer is unable to meet two parts of the prima facie test.  Specifically, she was not meeting her employer's legitimate expectations and was not treated less favorably than her male colleagues. Meyer disputes that she was not meeting the City's legitimate expectations. Moreover, male employees were treated more favorably than she was.

(1)

13

In claiming that Meyer did not meet its expectations, the City contends she was incompetent, inefficient and negligent in her response to a malfunction of the lime slaker on June 24, 2005. Ted Meckes's investigative report stated:

> There were 2 low raw pH visual alarms and numerous high filtered turbidity alarms that printed across the top of the computer screen between 7:49 a.m. and 9:30 a.m., none of which were reacted upon even despite the 8:09 a.m. acknowledgment of the low pH alarm. Even once the raw pH meter was cleaned, the low readings should have indicated further checking was needed to assure proper operation of the lime slaker.

The City alleges that Meyer's failure to act caused high turbidity levels in the water supply.

Meyer asserts there is a factual dispute as to her competence or negligence in responding to the incident. Others did not notice anything wrong with the lime slaker that morning. Meyer states that she acknowledged the alarm at 8:09 a.m. and she went out to look at the lime slaker and saw that it was feeding lime. Meyer further claims she was told by maintenance employees that they had just cleaned a pH meter in the "raw channel," which explained why the pH visual alarm went off. During

14

the cleaning of a pH meter, the meter is taken out of the raw channel and thus does not produce a reading until it is put back. Meyer states that the tests that were run around 8:30 a.m were in the normal range. The City asserts that the pH meter was cleaned at 7:50 a.m., not 8:09 a.m., and thus the cleaning of the meter could not explain the low reading.

Meyer contends there is a factual dispute as to whether she should have spotted the problem early from the monitors. She states there was no rule regarding when a monitor must be checked. Additionally, for the reasons previously noted, Meyer had no reason to suspect trouble. She further asserts that because she was trying to handle the situation, she should not be blamed for failing to properly notify her superiors, especially when they were already finding out about the situation. The City contends that if Meyer had been checking the computer screens every fifteen minutes, she would have detected that the lime slaker was not feeding.

Meyer claims that once the problem was discovered, she was busy working with Selinger to solve it. When the lime slaker went out, it was her priority to get the turbidity and pH back in line which took precedence over

15

all other tasks.  Meyer claims she was on the phone for a few minutes that morning on two occasions talking to Greg Finigan, who has degrees in Biology and Chemistry and has previously been consulted by the department, in order to get advice on how to correct the turbidity problem. She also briefly spoke to others that afternoon.

The City further contends that Meyer was dishonest by fabricating the actual time she took the 11:00 a.m. reading when asked by Meckes and Kim Lucas, the chemist.  The timing is important because Lucas was trying to determine what type of notification should be made to the IEPA.  After first saying the reading was taken earlier, Meyer admitted after the pre-deprivation hearing that it was taken at 12:50 p.m.  Meyer states that she did not intend to mislead Lucas about the 11:00 a.m. reading.  Rather, she simply reported the reading she had recorded without thinking about the time difference, as Meyer was continually trying to correct the turbidity problem.  Because the information is automatically recorded by the computer system and available instantaneously, moreover, Lucas had access to the information about which she inquired.  The City contends that

Meyer fabricated the reading so she would not get in trouble.

Meyer claims that there is a factual dispute as to whether she was dishonest while attempting to correct the problem. The samples are always run a little before or after the preprinted times because the operators are busy with other tasks. Meyer alleges there are no instructions to correct the time by changing the preprinted form. Senior Operator Jim Zeigler does not recall anyone crossing out the preprinted times on the operating sheet and recording the precise time of the test. Although the samples were taken sometime after noon, the 11:00 a.m. entry on the form was filled out because it was the next preprinted reading that was required.

Meyer further alleges that Jim Zeigler suggested that she record the fact of the later pH tests on the report. Meyer says that the following morning, she recorded that the 11:00 a.m. samples were run after 12 noon, which the City disputes. The City further contends that Meyer testified during the Civil Service Hearing that she made the notation later that week after the weekend had passed, which contradicts her affidavit.

Meyer notes that the City did not have to issue drinking water alerts

because of the incident.  There was no health danger to the public and no fines or penalties were assessed.  The City disputes this and contends there was a significant potential for health danger, especially given its contention that Meyer tried to fabricate lab values to protect herself.

(2)

The City asserts that Meyer was advised previously that data falsification and negligent performance of duty could lead to her dismissal. On August 15, 2003, she received a three-day suspension for negligent performance of duty and falsification of or misrepresentation of fact on or in conjunction with a departmental or public record regarding the loss of carbon feed.  On June 16, the carbon feed stopped feeding at 3:45 p.m. and was not restarted until 8:15 p.m.  However, Meyer recorded false data on the operator record when she recorded that carbon was flowing at 5:00 p.m. and 7:00 p.m.  The City contends that the lack of carbon could have resulted in major taste and odor problems in the water supply.

According to the City, Meyer and other operators were told to cross out the pre-printed time and put the correct time if a reading could not be

taken within ten to fifteen minutes of the required time.  They were so told in 2003 after the carbon feed incident that resulted in Meyer being disciplined.  Exhibit 3 submitted with the City's motion indicates that Ted Meckes told Meyer the day after the incident that if she were one hour late in performing her rounds, "then you need to write 8 not 7.  We want you to start your rounds at 3, 5, 7 odd hours.  But if for some reason you are late write down the real time."

Meyer alleges that she discovered her error and documented on the back of her log sheet that the 7 p.m. round was taken at 8 p.m. and carbon was not flowing.  She then called Ted Meckes and advised him of the error.  Thus, here was no fabrication or cover-up.  The City alleges that Exhibit 12 shows that she did not document the late reading on the back of the log sheet.  Meyer further contends that there were other occasions when the carbon did not flow for several hours and operators recorded that it was flowing.  All of these other employees were male.  Only Keith Groesch was disciplined.

The City further asserts that on October 3, 2003, Meyer was again

given a written warning for the falsification of or misrepresentation of fact on or in conjunction with a departmental or public record regarding her operations records for said date. It was discovered that she partially pre-filled a carbon data sheet and an operator checklist prior to the performance of her actual rounds and completion of the required duties for the prescribed time periods on those sheets. Meyer's written warning indicated in part that "information and operating parameters change over the course of a shift, and at no time should information be pre-filled." She was also told that similar incidents could result in "progressive discipline up to and including termination." Ted Meckes testified that he had no knowledge of anyone else ever pre-filling data.

Meyer claims that male employees have pre-filled operation sheets but only she has been disciplined for it. All data on the carbon data sheet was accurate. Meyer alleges this is how she was trained to fill out the forms and the way she has seen everyone else fill them out.

The City next contends that on January 5, 2004, Meyer received another written warning for negligent performance. In four separate

20

incidents, she failed to perform proper chlorine inspections and fill out the chlorine checklists as she had been trained.  Meyer indicated on the daily checklists that she had completed the work when she had not.  It was noted on the written warning that Meyer's forgetfulness calls into question her competence and operating skills.  She was warned that further such incidents could result in progressive discipline, including discharge.

Based on these multiple disciplinary incidents, it appears that Meyer was not meeting her employer's legitimate expectations.  It seems undisputed that there were occasions Meyer did not properly document an operator record or log sheet.  She contends, however, that other employees were, for the most part, not disciplined for such incidents.  The evidence is somewhat in dispute on this point.  Although there were instances in which Meyer was admonished for not properly recording data, such as when Meckes told her to write down the "real time" if she were late in performing her rounds, Jim Zeigler testified that he did not recall anyone crossing out the preprinted times on the operating sheets.  Thus, Meyer suggests that she was held to a different standard than other (mostly male) employees in

21

terms of documenting records.

Based on the foregoing, the second prong of Meyer's prima facie case dovetails somewhat with the fourth. The Court will thus proceed to consider whether the City treated similarly situated male employees more favorably.

(3)

In order to show that she was treated less favorably than her male colleagues, Meyer need not establish that these other employees were identical to her. However, she must at least show that they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Gates v. Caterpillar, Inc., 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citations omitted). "The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" Henry v. Jones,

507 F.3d 558, 564 (7th Cir. 2007) (quoting Barricks v. Eli Lilly and Co., 481 F.3d 556, 560 (7th Cir. 2007)).

The City contends that Meyer was not treated less favorably than her male colleagues. It disputes that employees such as Mike Pickett and Edwin Lee were treated more favorably than Meyer. Meyer alleges that Lee had a problem with the lime slaker overfeeding but was not terminated for it. Pickett also lost the feeding of lime on the lime slaker for approximately the same amount of time as Meyer.

The City contends that Pickett was involved in a single disciplinary incident in his career resulting in a verbal counseling, unlike Meyer who was counseled and disciplined numerous times before she was terminated. The incident involving Pickett related to the iron machine clogging up and lime slaker #2 that tripped. Pickett responded to the situation promptly and properly and did not try to cover it up or provide false data, as the City alleges Meyer did. Edwin Lee was given a three-day suspension for negligent performance of duty. This is the only disciplinary action received by Lee in his career with the City. He did not have numerous counseling sessions or

23

disciplinary actions like Meyer.

Pickett and Lee both had only one disciplinary infraction. Thus, those individuals are not sufficiently similar to Meyer, who was disciplined on multiple occasions prior to her termination.  Because Meyer's termination was the result of progressive discipline, the Court concludes that she is not similarly situated to Pickett or Lee.

(4)

Regarding the discipline for indicating that she performed a chlorine inspection on February 26, 2005, Meyer contends that all employees have missed filling out the chlorine checklist.  She claims there were several occasions when male employees failed to fill out the checklists and were not disciplined.  The City alleges that if Meyer observed other employees not filling out the chlorine checklist, she did not inform management.

As for the 2003 suspension for the carbon feed incident, Meyer asserts there were several occasions throughout her employment when the carbon had not been flowing for several hours and operators recorded that it was. These employees were male and were not disciplined, except for  Groesch.

Regarding the written warning on October 3, 2003, for partially pre-filling a carbon data sheet, Meyer contends that male employees have pre-filled out operation sheets but only she has been disciplined.  Once again, the City contends that if this was occurring, it was not brought to the attention of Ted Meckes.  Meckes had no knowledge this was occurring until the allegation was made at the Civil Service Hearing.  Nonetheless, Meyer was told not to pre-fill data after the carbon feed incident.

(5)

The only individual identified by Meyer who might possibly be described as similarly situated to her is Keith Groesch.  Groesch was disciplined on more than one occasion and, like Meyer, was told that further discipline could result in his termination.  Both individuals were brought up on civil service charges that would result in their termination and both were given the opportunity to be transferred to another City department.  Groesch accepted the City's offer and was demoted and transferred into another department in lieu of termination.  Groesch was paid $8.00 per hour less in his new position.  Meyer refused the same offer and was

25

terminated.  If she had accepted the offer, Meyer would have remained employed with the City, though in a different department.  Thus, they were treated similarly in this respect.

Meyer alleges that when Groesch was offered the choice between transfer and termination, he was told that he would be paid close to what he was then making, whereas she was not told the same thing.  According to the "Personnel Transaction" noting his demotion and salary reduction, Groesch's pay was reduced from nearly $25 per hour to almost $17 per hour.  It is thus difficult to argue that Groesch's salary after his demotion was "close" to what it previously was.

Because Meyer did not accept the City's offer, the Court cannot determine how her salary in a new position would have compared to that in her previous position.  However, the "Disciplinary Resolutions" as to Groesch and Meyer are nearly identical regarding pay.  Both state that the parties agree to a "transfer" to any "city department, position and pay rate at the City's sole discretion."  Thus, Groesch and Meyer were not treated differently with respect to salary.

26

Keith Groesch is the only male who arguably was similarly situated to Meyer. Because Meyer is unable to show that she was treated less favorably than Groesch or any similarly situated male, therefore, the Court finds that she is unable to make out her prima facie case of sex discrimination.

## III. CONCLUSION

After considering the evidence in the light most favorable to Meyer, the Court concludes she has not shown that the City treated similarly situated males more favorably. Like Groesch, Meyer was given the opportunity to serve a lengthy suspension and receive a transfer/demotion in lieu of termination, an offer which she declined. Because Meyer is unable to meet an element of her prima facie case, the City is entitled to summary judgment.

<u>Ergo</u>, the Defendant's motion for summary judgment [d/e 18] is ALLOWED.

The Clerk will enter judgment in favor of the Defendant.

ENTER: January 8, 2009

FOR THE COURT:

27

s/Richard Mills
United States District Judge